**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**MICHAEL EDWARD PAIR,**
        **Plaintiff,**

**vs.**                                                  **5:05cv137/SPM/MD**

**OFFICER AARON WILSON;
DEPUTY GREG DEARTH;
INV. ROBERT DUNCAN; and
INV. RICHARD BAGWELL;**
            **Defendants.**

---

### REPORT AND RECOMMENDATION

        **This case filed pursuant to 42 U.S.C. § 1983 is now before the court upon the defendants' special reports.  (Doc. 20 & 22).   The pro se plaintiff, who is proceeding *in forma pauperis* in this action,[1] filed a response in opposition to the special report on September 13, 2002 (doc. 15).   On December 6, 2006, this court entered an order advising the parties of the importance and ramifications of Rule 56 summary judgment consideration, and informing the parties that the special reports would be construed as motions for summary judgment as of January 8, 2007 (doc. 48). Neither party filed any additional argument or evidence.**

        **Upon review of the submissions of the parties, it is the opinion of the undersigned that the motion for summary judgment of Officer Wilson should be**

---

[1]Court records reflect that plaintiff has paid the entire $250.00 filing fee, through installment payments. (See Doc. 5, 12, 30, 41, 47, 49 & 52).  The last payment of $21.00 was transferred to plaintiff's criminal case, 5:05cr26, to offset amounts still due for the special monetary assessment.

granted in part and denied in part, and the remaining defendants' motion for summary judgment should be granted.

Background

Plaintiff's allegations

In his second amended complaint (doc. 9) (henceforth "complaint"),[2] plaintiff complains of violations of the fourth and fourteenth amendment, and names four defendants: Officer Aaron Wilson of the Parker Police Department, and Deputy Greg Dearth, Investigator Robert Duncan and Investigator Richard Bagwell of the Bay County Sheriff's Department.  Plaintiff states that on June 5, 2002, Officer Aaron Wilson subjected him to an "illegal" traffic stop.  Plaintiff claims that he was held on the side of the road in the middle of the night for no legitimate reason so that a drug dog could be called even though there was no basis for belief that he was involved with drugs.  A deputy Adam Buff, who is not named as a defendant in this action, arrived with his K-9, and Buff and Wilson searched plaintiff's van.  After finding no drugs, Officer Wilson issued plaintiff a citation for open container and he was allowed to leave.

On October 1, 2002 plaintiff states that Officer Wilson and Deputy Dearth came to his home, forced entry, arrested him and searched the home.  Deputy Dearth conducted a search of plaintiff's backyard and called Investigators Duncan and Bagwell, advising them that he had found evidence of a methamphetamine lab. Duncan and Bagwell then searched plaintiff's backyard and van, and obtained a search warrant for plaintiff's home containing misrepresentations of material fact.

Plaintiff claims that when Officer Wilson entered plaintiff's home on October 1, 2002, he was outside of his jurisdiction and conducted an illegal search and arrest.  He further states that Officer Wilson exceeded the bounds of his authority,

---

[2]The allegations in this complaint were sworn under penalty of perjury on October 24, 2005.

falsely arrested and imprisoned the plaintiff because the arrest warrant was not issued by a judge.

Plaintiff contends that Deputy Dearth and Investigators Duncan and Bagwell conducted an illegal search and seizure, and that Duncan and Bagwell maliciously procured a search warrant, illegally entered plaintiff's home, invaded his privacy, improperly served and executed a search warrant and made knowing false statements in their affidavits.

Plaintiff seeks damages in the amount of $250,000 against each defendant in his individual capacity, as well as any other nominal, compensatory and exemplary damages the court finds appropriate.

Although plaintiff does not so state in the most current version of the complaint, in his previous complaint he maintained that the evidence seized as a result of these searches was suppressed and all charges against him were dismissed. This court may take judicial notice of its own records.[3] In case number 5:03cr16/RH, plaintiff was charged with manufacturing a controlled substance, methamphetamine, and knowing possession of an unregistered firearm.[4] Pair moved to suppress the items seized during the initial detention and thereafter, claiming that the detention was unlawful and anything seized as a result thereof was fruit of the poisonous tree. (5:03cr16/RH, doc. 27). After a hearing, the district court agreed, and entered an order granting the motion to suppress. (5:03cr16/RH, doc. 34).[5] Pair had also filed a second motion to suppress, challenging the legality of the search warrant executed at his home, claiming that the supporting affidavit

---

[3]*United States v. Rey*, 811 F.2d 1453, 1457 n. 5 (11th Cir. 1987) ("A court may take judicial notice of its own records and the records of inferior courts.").

[4]The time frame identified in the indictment was "from a date unknown, but at least by on or about September 15, 2002, and continuing to on or about October 1, 2002." (Case 5:03cr16/RH, doc. 1).

[5]The facts as found by the district court in its order are not exactly as plaintiff has presented them in this case. The basis for the court's ruling was that the plaintiff was held longer than necessary to dispel the suspicion that led to the stop and to process the traffic citation. (Case 5:03cr16, doc. 34 at 13).

contained misrepresentations of material fact.  (5:03cr16/RH, doc. 33).  This motion was denied as moot in light of the court's ruling on the previously filed motion. (5:03cr16/RH, doc. 36).  The court noted that the second motion dealt "only with evidence already suppressed as a result of the granting of the first motion to suppress."  As a result of the court's ruling on the motions to suppress, the government moved to dismiss the indictment, and its motion was granted. (5:03cr16/RH, doc. 35 & 37).

On August 2, 2005, after the plaintiff filed the instant case, another federal indictment was returned against him for conspiracy to manufacture, distribute and possess with intent to distribute a controlled substance, and manufacturing and possessing with intent to distribute methamphetamine. (5:05cr26/MCR).  The alleged offense conduct in the second indictment took place between May 1, and May 12, 2005, and the charges thus appear to be unrelated to the claims made by plaintiff in the pending second amended complaint.  Pair entered a plea of guilty in that case, which he later unsuccessfully moved to withdraw. (5:05cr26/MCR, doc. 43). He also moved unsuccessfully to dismiss the indictment.  (See doc. 66, 74, 81, 82, 83).  Pair was sentenced to a term of 120 months imprisonment.  The plaintiff's criminal case is currently pending on appeal.

### Defendant Wilson's Special Report

Officer Wilson, the only defendant from the Parker Police Department,[6]  has filed a special report separate from that filed by the other three defendants.  (Doc. 22).  In conjunction with this special report, he has filed an affidavit[7] with copies of his field notes and an offense report prepared on October 1, 2002, the October 1, 2002 arrest warrant, the transcript of the district court's hearing on defendant's

---

[6]Officer Wilson was formerly employed by the Bay County Sheriff's Office but was fired for allegedly lying to get a warrant.  (Doc. 22, exh. 2 at 15).

[7]This affidavit will be referred to within this recommendation as "Wilson aff. ¶ ___.

motion to suppress[8] and the court's order thereon,[9] and the affidavit of defendant Gregg Dearth that was filed in support of Dearth's special report.  Officer Wilson describes the events pertinent to the plaintiff's complaint as follows:

In the early morning hours of June 3, 2002, while on duty as a certified law enforcement officer employed by the City of Parker Florida Police Department, Officer Wilson observed plaintiff leaving the front door area of a bar that he believed closed for business.  (Tr. at 5-7; Wilson aff. ¶ 1).  Plaintiff was carrying a box which he placed into a van that he then drove from the parking lot of the bar.  (*Id.*)  Wilson followed the plaintiff and pulled him over to investigate what Wilson suspected to be criminal activity.  (Tr. at 7-8).  Upon approaching the plaintiff's van, Officer Wilson noticed what he believed to be an open bottle of beer on the van's center console.  (Tr. at 8).  Plaintiff told Officer Wilson that he was a guitarist and that he had been talking to the bar management about playing at the bar.  (Tr. at 9).  When Wilson asked to see the box plaintiff had taken out of the bar, plaintiff refused.  Wilson then returned to his patrol car with plaintiff's driver's license and radioed the Bay County Sheriff's Office ("BCSO") for a canine unit, with the intention of writing plaintiff a citation for open container.  (Tr. at 9-10).  As he was writing the ticket, a woman known to him to be the owner of the bar drove up to the scene and explained that plaintiff was with her.  (Tr. at 10).  Officer Wilson ordered her away from the scene and continued writing the citation.  (*Id.*).  BCSO Deputy Adam Buff and his canine also arrived as plaintiff was writing the citation.  (Tr. at 11-12).  Deputy Buff deployed his dog, and the two officers searched the vehicle after the dog alerted.  (Tr. at 12).  Officer Wilson located and seized some small clear plastic bags, empty ephedrine bottles, a set of electronic scales and a bottle of butane, which were turned over to the Florida Department of Law Enforcement Crime Lab for chemical analysis.  (Tr. at 12, 13-14).  Plaintiff was not arrested, but was allowed to depart from the scene,

---

[8]This transcript will be referred to within this recommendation as "Tr. at ___."

[9]This order will be referred to within this recommendation as "Order at ___."

still in possession of his open container.   (Tr. at 13; Order at 6 n.10). Methamphetamine residue was found on two empty plastic containers and on the electronic scales.   (Wilson aff. ¶ 4, and att. 4, FDLE Chemical Analysis Report).

On October 1, 2002, Officer Wilson accompanied by BCSO Deputy Gregg Dearth went to plaintiff's residence with respect to follow-up investigation regarding the defendant's alleged possession of controlled substances.   (Dearth aff. ¶ 2). Dearth was present because plaintiff's residence was outside the jurisdiction of the Parker Police Department.   (*Id.*).   While Wilson approached the door of the residence, Deputy Dearth walked around the van that was parked nearby to ensure it was unoccupied.   (Dearth aff. ¶ 3).   He observed a container of Coleman Fuel sitting in plain view within the cargo compartment.   (Dearth aff. ¶ 3).   When there was no answer to Wilson's knock at the door of the residence, Dearth walked back around the van and observed, in plain view, what appeared to be remnants of a methamphetamine lab.   (Dearth aff. ¶ 4).   Wilson told Dearth that he was going to get an arrest warrant and both officers left the area.   (Dearth aff. ¶ 5).

On October 1, 2002, Wilson sought the issuance of an arrest warrant from the Honorable Elijah Smiley, Bay County Court Judge, for plaintiff's possession of methamphetamine based on the FDLE lab results of analysis of the items seized from plaintiff's van on June 3, 2002.   (Wilson aff. ¶ 5 & 6, and attachment I, affidavit-- complaint probable cause narrative).

Dearth's affidavit reflects that procuring the warrant only took a few hours, because within that time frame Deputy Dearth learned from Officer Wilson that he had obtained an arrest warrant.   (Dearth aff. ¶ 6).   Again, Dearth was called upon to assist due to plaintiff's residence being outside the jurisdiction of the Parker Police Department.   Wilson's affidavit provides no details about the arrest.   Dearth states in his affidavit that he and Wilson returned to plaintiff's residence and knocked on the door.   A female who answered the door gave them consent to enter and pointed to a back room where plaintiff was sleeping.   (Dearth aff. ¶ 6).   The officers found

plaintiff in the rear bedroom of the mobile home and observed in plain view a clear plastic baggie containing marijuana on the dresser at the foot of the bed in this room.  (Dearth aff. ¶ 7).  Plaintiff was taken into custody.

**Special Report of Defendants Dearth, Duncan, and Bagwell**

The remaining three defendants also filed affidavits in support of their special report.  (Doc. 20). The majority of defendant Dearth's affidavit was summarized in the previous section to explain the actions of defendant Wilson, and matters already set forth will not be repeated here.

Deputy Dearth contacted Deputy Robert Duncan and explained that during the course of assisting Officer Wilson at plaintiff's residence he had observed what he believed to be remnants of a methamphetamine lab on the property, as well as suspected marijuana in plaintiff's bedroom. (Dearth aff. ¶ 8).  Duncan advised Dearth to secure the scene, which he did until Deputies Duncan and Richard Bagwell arrived.  Duncan subsequently obtained a warrant to search the residence.  (Dearth aff. ¶ 9).  Deputy Dearth continued to secure the residence until the warrant was obtained, and with the exception of briefly leaving the scene to transport Rhonda Couch, who was arrested at the residence, to the Bay County Jail, Deputy Dearth remained there until the search was completed.  (Dearth aff. ¶ 9).

Deputy Robert Duncan states in his affidavit that he is a certified law enforcement officer employed since January of 1989 as a Bay County deputy sheriff. (Duncan aff. ¶ 1).  On October 1, 2002, Deputy Gregg Dearth contacted him about a possible methamphetamine lab located at 119 Simms Avenue, Lot M, Callaway, Bay Co., Florida.  (Duncan aff. ¶ 2).  Deputy Duncan has taken courses that certify him to recognize, search and dismantle clandestine methamphetamine labs.  (Duncan aff.¶ 2).

Deputy Duncan went to the plaintiff's residence where Deputy Dearth explained to him that he had been assisting Officer Wilson in serving an arrest

warrant on Mr. Pair at that residence and that Dearth had observed serval propane tanks which were not attached to any grills or burners, waste cans of acetone toluene and Coleman fuel.  (Duncan aff. ¶3 & 4).  Dearth also indicated that while the officers were executing the arrest warrant they observed a small bag of suspected marijuana lying in plain view in the bedroom where the plaintiff was located. (Duncan aff. ¶ 4).

Deputy Duncan asked Rhonda Couch, who also resided in the mobile home, for consent to search, but permission was denied.  Duncan had members of the Bay County Sheriff's Office Field Services Division secure the scene while he prepared an application for a search warrant.  (Duncan aff. ¶ 5).  The search warrant application was presented to Judge Elijah Smiley in chambers on October 1, 2002. (Duncan aff. ¶ 6).  Duncan states that there were no false statements in this application. (Duncan aff. ¶ 6).  The signed warrant provided authority for the search of the residence occupied by Michael Pair, including "the curtilage thereof, and vehicles parked thereon and any persons present." (Duncan aff. ¶ 6, search warrant attached as doc. 20-3, p. 10).

Duncan returned to the plaintiff's residence to execute the search warrant assisted by Deputy Richard Bagwell also of the BCSO.  Upon entry into the residence, he states that he identified a dormant methamphetamine lab.  However, several jars in the lab contained liquids that were separating, which was indicative of previous use.  He also found a pamphlet on "How to make explosive devices" along with a black box with a blue interior that was used for making a pipe bomb and a small explosive device. Tyndall Air Force Base Explosive Ordinance Disposal Unit and the Federal Bureau of Alcohol, Tobacco and Firearms came to the scene and took custody of the items.  (Duncan aff. ¶ 7).

After the search and investigation of the clandestine lab was completed, Duncan states that he had no further involvement at the plaintiff's residence. (Duncan aff. ¶ 8)

Deputy Richard Bagwell states in his affidavit that he is a certified law enforcement officer who has been continuously employed for the past 16 ½ years as a Bay County Deputy Sheriff.  (Bagwell aff. ¶1).  On the date of the search, he was an Investigator in the Special Investigations Division of the BCSO.  He was riding with Deputy Duncan when Duncan received the call from Deputy Dearth about the possible methamphetamine lab Dearth had observed while serving an arrest warrant at 119 Simms Ave., Lot M., Callaway, Bay Co., Florida.  Deputy Bagwell states that he and Deputy Duncan had recently taught a course at the BCSO that addressed the recognition of methamphetamine labs, and that Deputy Dearth had attended the class.  (Bagwell, aff. ¶¶ 2-3).

After their arrival, Deputy Duncan asked Rhonda Couch, who also resided in the mobile home, for permission to search the residence, but it was denied. (Bagwell, aff. ¶4).  Deputy Duncan left the area to obtain a search warrant, and when he returned, Bagwell assisted him in executing the warrant.  (Bagwell aff. ¶5). Bagwell identified a methamphetamine lab upon entering the residence.  He also noted the presence of the same explosive items mentioned by Duncan in his affidavit. (Bagwell aff. ¶6).  Bagwell states that during the search and investigation, he primarily dismantled the methamphetamine lab, and Deputy Duncan cataloged the items removed from the residence.  (Bagwell, aff. ¶7).  Finally, he notes that Deputy Duncan was the case agent for this case, and so it was not necessary for Bagwell to prepare any reports because this was done by Deputy Duncan.  (Bagwell aff. ¶ 8).

<u>Legal Analysis</u>

<u>Summary Judgment Standard</u>

On a motion for summary judgment, this court must  evaluate the record in the light most favorable to plaintiff as the nonmovant and grant defendants' motion only if the record demonstrates that there is no genuine issue of material fact and that

defendants are entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986); *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002); F.R.C.P. 56. The court must resolve all disputes and draw all inferences in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); see also *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir.1999). Summary judgment is improper "[i]f a reasonable fact finder could draw more than one inference from the facts, and that inference creates a genuine issue of material fact." *Cornelius v. Highland Lake*, 880 F.2d 348, 351 (11th Cir. 1989), *cert. denied*, 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Id.*; *see also Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986). Finally, it is improper for the district court to make credibility determinations on a motion for summary judgment. *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006); *Bischoff v. Osceola County*, 222 F.3d 874, 876 (11th Cir. 2000); *Harris v. Ostrout*, 65 F.3d 912, 916-17 (11th Cir. 1995); *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1531 (11th Cir. 1987).


### Eleventh Amendment Immunity

Plaintiff does not specifically state whether he sues defendants in their official or individual capacities. Of course, to the extent plaintiff sues the defendants in their official capacities, they are entitled to Eleventh Amendment immunity. A suit against a state employee in his or her official capacity is deemed to be a suit against the state for Eleventh Amendment purposes. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45, 58 (1989). Absent waiver or express

congressional abrogation, neither of which is present in this case, the Eleventh Amendment prohibits a suit against a state in federal court. *Kentucky v. Graham*, 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Gamble v. Florida Department of Heath and Rehabilitative Services*, 779 F.2d 1509, 1511 (11th Cir. 1986). Hence defendants are entitled to Eleventh Amendment immunity to the extent the plaintiff sues them in their official capacities.

<u>Qualified Immunity</u>

"Qualified immunity protects government officials performing discretionary functions from suits in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Anjular v. Rodriguez,* 486 F.3d 1199 *Dalrymple v. Reno*, 334 F.3d 991, 994 (11th Cir. 2003) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982))); see also *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (ruling that qualified immunity "protect[s] from suit 'all but the plainly incompetent or one who is knowingly violating the federal law' " (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001)))."Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Matthews v. Crosby,* 480 F.3d 1265, 1269 (11th Cir. 2007) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (internal citations and quotation marks omitted)).

In order to receive the protection of qualified immunity, the government official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Mathews,* 480 F.3d at 1269 (citing *Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004) (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002))); *Harlow v. Fitzgerald*, 457 U.S. 800, 102

S.Ct. 2727, 73 L.Ed.2d 396 (1982).   Once eligibility for qualified immunity is established, the burden shifts to the plaintiff to show that qualified immunity is not appropriate.  *Matthews,* 480 F.3d at 1269 (citing *Lee*, 284 F.3d at 1194). This step consists of a two-part inquiry, set forth in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).  First, the court must ask, "do the facts alleged show the government official's conduct violated a constitutional right?" *Matthews*, (quoting *Saucier,* 533 U.S. at 201).  If no constitutional violation is shown, the inquiry ends, as the question of qualified immunity need not be addressed.  *Campbell v. Sikes*, 169 F.3d 1353, 1361-62 (11th Cir. 1999). If a constitutional violation is established, viewing the facts in the light most favorable to the plaintiff, the court then must determine whether such conduct would have violated federal law that was clearly established at the time of the incident.  *Matthews,* 480 F.3d at 1269 (citing *Garrett v. Athens-Clarke County*, 378 F.3d 1274, 1278-79 (11th Cir. 2004) (citing *Saucier*, 533 U.S. at 201-02)).  The state of the law must have given defendants "fair warning that their alleged treatment of [the defendant] was unconstitutional." *Andujar v. Rodriguez*, 486 F.3d 1199, 1204-1205 (11th Cir. 2007) (quoting *Hope* 536 U.S. at 741, 122 S.Ct. 2508, and *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.")).

<u>Plaintiff's Fourth Amendment Claims</u>
<u>Officer Wilson</u>
<u>Traffic Stop on June 3, 2002</u>

Plaintiff first contends that Officer Wilson subjected him to an illegal traffic stop on June 3, 2002.  As noted above, the validity of the traffic stop was challenged in plaintiff's criminal case.  It was also challenged in state court in the case of State of Florida vs. Rhonda Couch, 02-2815B; 02-2821B.  (Doc. 43, attached Order Granting

Motion to Suppress dated June 27, 2003). In both instances the traffic stop was found to be invalid.[10]

Officer Wilson does not discuss or even mention the state court ruling in his special report.  With respect to the federal court ruling, he contends that it should not collaterally estop him from litigating the alleged violation of plaintiff's Fourth Amendment rights because he was neither a party in the prior action, nor in sufficient privity with the United States government to be bound by this decision.

Collateral estoppel precludes a party from litigating an issue that was fully litigated in a previous action involving a party to the first case.  *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980); *Dailide v. U.S. Atty. Gen.,* 387 F.3d 1335, 1342 (11th Cir. 2004) (citing *Pleming v. Universal-Rundle Corp.*, 142 F.3d 1354, 1359 (11th Cir. 1998); *Palciauskas v. United States*, 939 F.2d 963, 966 (11th Cir. 1991)).  Collateral estoppel applies to section 1983 actions involving alleged Fourth Amendment violations.  *Allen v. McCurry*, 449 U.S. 90, 92, 96-104, 101 S.Ct. 411, 413-414, 415-420, 66 L.Ed.2d 308 (1980); *Farred v. Hicks,* 915 F.2d 1530, 1533 (11th Cir. 1990) (courts can give preclusive effect to judgments rendered in state criminal proceedings); *Munz v. Parr*, 972 F.2d 971 (8th Cir. 1992) (plaintiff cannot relitigate issue decided adversely to him in criminal action); *Ayers v. City of Richmond*, 895 F.2d 1267, 1271 (9th Cir. 1990) (same, noting both suppression hearing and civil rights action involved constitutionality of arrest, party against whom collateral estoppel was asserted was party to both civil and criminal action, adverse rulings in suppression hearing were fully and fairly litigated on the merits, and civil rights plaintiff had motivation to fully litigate Fourth Amendment issue presented at suppression hearing.)  In order for the doctrine to apply, the following criteria must be satisfied: (1) the issue at stake is identical to the one involved in the prior

---

[10]The state court found that there was no basis for the initial stop, as well as finding that even if there had been, there was no basis for the continued detention after the open container citation was written. (Case 5:03cr16, doc. 34, Order Granting Motion to Suppress at 8).

proceeding; (2) the determination of the issue in the prior litigation must have been "a critical and necessary part" of the judgment in the first action; (3) the issue was actually litigated in the prior proceeding; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding. *Dailide*, 387 F.3d at 1342 (citing *Pleming*, 142 F.3d at 1359); *see also Travieso v. Federal Bureau of Prisons, Warden*, 2007 WL 496638, *3+ (11th Cir. 2007) (Table, text in WESTLAW)(also citing *Pleming*).  Furthermore, the parties must be the same, or in privity for collateral estoppel to apply.  *E.E.O.C. v. Pemco Aeroplex, Inc.,* 383 F.3d 1280, 1285 (11th Cir. 2004).   And, if neither can be established, the collateral estoppel analysis need go no further.  *Id.*

The *Pemco* court defined "privity" as a flexible legal term that is used when a person, although not a party, has his interests adequately represented by someone with the same interests who is a party. *Id.* (Citing *Hansberry v. Lee*, 311 U.S. 32, 41-43, 61 S.Ct. 115, 117-119, 85 L.Ed. 22 (1940)).   The Eleventh Circuit has not specifically addressed the question of privity of a state law enforcement officer to the federal government with respect to litigation of a Fourth Amendment claim in a federal criminal case.    But see *Farred v. Hicks*, 915 F.2d 1530, 1533 (11th Cir. 1990)(no privity of state officer with the state of Georgia in a criminal case); *Shamaeizadeh v. Cunigan*, 338 F.3d 535 (6th Cir. 2003) (same); *Turpin v. County of Rock*, 262 F.3d 779 (8th Cir. 2001) (same). The reasoning of *Farred, Shamaeizadeh* and *Turpin* is applicable here.  Furthermore, there is no recognized form of privity that would apply to defendant Wilson.  Only "virtual representation" seems even remotely plausible.  "Virtual representation" is a term of art that applies when the respective interests are closely aligned *and* the party to the prior litigation adequately represented those interests.  *Pemco*, 383 F.3d at 1287 (internal quotations and citations omitted).  This is a factual determination that is answered by considering whether there was "participation in the first litigation, apparent consent to be bound, apparent tactical maneuvering, [and] close relationships

between the parties and nonparties." *Id.* (Quoting *Jaffree v. Wallace*, 837 F.2d 1461, 1467 (11th Cir. 1988) (quoting 18 Wright & Miller, Federal Practice & Procedure § 4457, at 494-99) (alteration in original)).   Upon consideration, it cannot be said that Wilson was "virtually represented" by the United States in its prosecution of the plaintiff, and collateral estoppel does not apply to the district court's ruling as applied to Officer Wilson.   See *Pemco*, 383 F.3d at 1287-1289; cf. *Farred, Shamaeizadeh, Turpin, supra*.

In order to determine whether collateral estoppel applies with respect to the state court ruling on the constitutionality of the June 2002  traffic stop, the court must look to the operation of the state's law of collateral estoppel. *Farred v. Hicks,* 915 F.2d 1530, 1533 (11th Cir. 1990) (citing *Webb v. Ethridge*, 849 F.2d 546, 549 (11th Cir. 1988)); *Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980.  As noted above, in *Farred,* which was decided under Georgia law, the court held that the law enforcement officers failed to satisfy the "mutuality" or "privity" requirement, because although the civil rights plaintiff had been a party to both the criminal and civil cases, the law enforcement officers whose actions were being challenged had not been.  915 F.2d at 1534.

The essential elements of the doctrine of collateral estoppel under Florida law are that the parties and issues be identical, and that the particular matter be fully litigated and determined in a contest which results in a final decision of a court of competent jurisdiction.   See *Dadeland Depot, Inc. v. St. Paul Fire and Marine Ins. Co.,* 945 So.2d 1216, 1235 (Fla. 2006) (citing *Department of Health & Rehabilitative Services v. B.J.M.*, 656 So.2d 906, 910 (Fla.1995)); see also *Mobile Oil Corp. v. Shevin*, 354 So.2d 372, 374 (Fla. 1977); *Hicks v. Hoagland*, 953 So.2d 695 (Fla. 5th DCA 2007); *Burns v. Daimler Chysler Corp.*, 914 So.2d 451, 453 (2005).  The court's analysis ends with its determination of the identity of the parties.  The Supreme Court of Florida has held that an arresting officer whose affidavit in support of a search warrant is successfully challenged in a criminal case is not in privity with the

state such that liability under § 1983 is automatic.  *Gentile v. Bauder*, 718 So. 2d 781, 783-784 (Fla. 1998) (citing *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987);  *Trujillo v. Simer*, 934 F.Supp. 1217, 1225 (D.Colo.1996); *Tierney v. Davidson*, 133 F.3d 189, 195 (2nd Cir. 1998)).  Thus, such a law enforcement officer would later be entitled to raise the defense of qualified immunity. *Id.*;  *Tierney v. Davidson*, 133 F.3d 189, 195 (2nd Cir. 1998) (trial court erred in collaterally estopping police officer from raising qualified immunity based on prior suppression order).

The doctrine of collateral estoppel does not apply to either the state court or federal court finding that the June 3, 2002 traffic stop was unconstitutional. Although Officer Wilson has offered no additional argument in support of his contention that no constitutional violation occurred, the court must engage in an independent review of the record with respect to the constitutionality of this defendant's  actions.

In *United States v. Purcell,* 236 F.3d 1274, 1277 (11th Cir. 2001), decided before the traffic stop in question, the Eleventh Circuit stated that the duration of a traffic stop must be limited to the time necessary to effectuate the purpose of the stop.  236 at 1277 (citing *United States v. Pruitt*, , 174 F.3d 1215, 1219 (11th Cir. 1999)).  Holding a driver for longer than reasonably necessary to issue any appropriate citation, without other permissible grounds for the detention, is unconstitutional.  *United States v. Pruitt*, 174 F.3d 1215 (11th Cir. 1999) (holding unconstitutional a search conducted after officer delayed writing speeding ticket and held defendant waiting for arrival of drug dog until "[n]early one-half hour after" the initial stop.)  In *Purcell*, the Eleventh Circuit held that bright-line rules are inadvisable in most issues relating to the constitutionality of a traffic stop.  236 F.3d at 1278.  The touchstone of the Fourth Amendment is reasonableness, which is measured by the totality of the circumstances.  *Id.* at 1278-1279 (citing  *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct.

1801, 114 L.Ed.2d 297 (1991)).  The court further stated that "[r]igid time limitations and bright-line rules are generally inappropriate." *Id.* at 1279 (citing *United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *United States v. Hardy,* 855 F.2d 753, 759 (11th Cir. 1988)).   There are two salient Eleventh Circuit cases addressing the detention of an individual beyond the writing of a traffic citation in order to have a drug dog inspect a vehicle.   In *United States v. Hardy* 855 F.2d 753 (11th Cir. 1988), the Eleventh Circuit upheld a roadside detention to await a drug dog for 50 minutes.  In *Pruitt, supra,* the court disapproved a detention of less than 30 minutes when officer appeared to be acting on an "unsupported hunch" instead of reasonable suspicion that occupants had broken anything other than speeding laws.  The defendant in this case has not advanced, and the record does not reflect, that he harbored any articulable suspicion of other illegal activity that would have justified the continued detention of plaintiff Pair.  See *Purcell*, 236 F.3d at 1277 (citing *United States v. Holloman,* 113 F.3d 192, 196 (11th Cir. 1997)).  Thus, although there is no bright line rule on the quantity of time that is reasonable, it is well established that it is constitutionally improper to hold a person longer, for even a few minutes, than is justified to complete the initial purpose of the stop.

Plaintiff Pair (then defendant) conceded in his criminal case that the actual traffic stop was not improper at the outset.  The initial justification for the stop, investigation of burglary, evaporated when the owner of the bar arrived and advised Officer Wilson that plaintiff Pair was known to her and nothing was amiss.  By that time, Wilson had observed the open container in Pair's vehicle, so he could permissibly detain Pair until the citation was issued.  The timing of the arrival of the drug dog[11] is key to the constitutionality of the continued detention, and this issue is in dispute.  Plaintiff does not state when the drug dog arrived with respect to the writing of the citation.  However, there is conflict in the record.  Officer Wilson

---

[11]The district court found it nonsensical that Wilson did not cancel his request for a canine unit once he had been assured that no burglary had occurred.  (Doc. 22, exh. 3 at 4 n.7).

testified before the district court that the canine unit arrived while he was writing the citation. (Doc. 22, exh. 2 at 11). The district court did not credit this testimony, as it found Pair's detention continued from 9 to 18 minutes longer than necessary to complete the citation. (Doc. 22, exh. 3 at 11). Because Wilson was not in privity with the government in Pair's federal criminal case, the district court's factual determination about when the drug dog arrived and its conclusion that a constitutional violation occurred is not dispositive in this case. Without making its own factual determination, this court cannot find that Officer Wilson violated clearly established law. Because this factual matter is in dispute, and certainly is "material," defendant is not entitled to summary judgment.[12]

### Arrest and Search on October 1, 2002

Plaintiff also contends that on October 1, 2002, Officer Wilson "forced entry" into plaintiff's home and arrested him and conducted a search while inside the home. Plaintiff contends that this was illegal because Wilson was out of his jurisdiction, and the arrest warrant was "not issued by a judge." In his reply, he further contends that Officer Wilson did not have statutory authority to obtain or execute an arrest warrant under state law under 901.04, Florida Statutes.

Plaintiff states in his complaint that the officers "forced" their way into the home. However, the only affidavit to address this issue from one of the two law enforcement officers present to execute the arrest warrant states that Rhonda Couch gave them permission to enter the mobile home. (Dearth aff. ¶ 6). Because plaintiff admits he was sleeping in a back bedroom, any assertion to the contrary is unsupported.

---

[12]The court notes that even if a jury finds in plaintiff's favor, he may only be entitled to receive nominal damages in the amount of $1.00. See *Hector v. Watt*, 235 F.3d 154, 162 (3rd Cir. 2000) (awarding nominal damages of $1.00 to plaintiff who, after prevailing in a motion to suppress evidence in a criminal case against him, brought a civil action claiming his rights were violated by an unlawful search and seizure).

Plaintiff also contends that the warrant "was not issued by a judge." The basis for his contention is unclear. The warrant is clearly signed by Judge Elijah Smiley.[13]

Plaintiff contends that Officer Wilson, an employee of the Parker Police Department did not have statutory authority to execute an arrest warrant. Section 901.04, Florida Statutes provides:

> Warrants shall be directed to all sheriffs of the state. A warrant shall be executed only by the sheriff of the county in which the arrest is made unless the warrant is made in fresh pursuit, in which event it may be executed by any sheriff who is advised of the existence of the warrant. An arrest may be made on any day and at any time of the day or night.

901.04, Florida Statutes (2006).[14] "Sheriffs" is not an umbrella term for law enforcement officers, as other sections of the statute specifically refer to "law enforcement officer, sheriff, deputy sheriff or other arresting officer," see § 901.215, or "peace officer," see § 901.16, simply "law enforcement officer," see § 901.15, or "federal law enforcement officer," see § 901.1505.

Although there does not appear to be any case law on point, the Office of the Attorney General issued an advisory opinion in 1993 suggesting that under the statute, a sheriff could permissibly delegate authority to execute and serve civil and criminal process of the courts to municipal police officers by appointing these officers as special deputies to serve process. Fla. AGO 93-69, 1993 WL 426169 (Fla. A.G.) The opinion cited an earlier Attorney General Opinion suggesting that municipalities posses no home rule power to grant their police officers the authority to execute process of the courts.  Fla. AGO 81-38.

---

[13]Plaintiff offers Judge Smiley's oath of office as proof that the signatures do not match, and therefore the warrant was not signed by Judge Smiley.  (Doc. 43, attachment).  While the signature on the oath of office is slightly more legible than the signature on the warrant, at least with respect to the judicial officer's surname, the court is not comfortable concluding that the signatures were not executed by the same individual.

[14]This section was last modified in 1973.

Plaintiff's assertion that Officer Wilson did not have statutory authority to execute an arrest warrant appears to be facially correct.  Defendants have not addressed this issue or explained whether officers of the Parker Police Department are deputized by the Bay County Sheriff such that they possess the authority to do so.  However, Dearth stated in his deposition taken with respect to the state court proceedings against plaintiff and Rhonda Couch that he was at the scene "being a representative of the sheriff's office to serve the warrant" and because "the case took [Officer Wilson] away from Callaway."  (Case 5:03cr16, doc. 22 at 20).  Thus, while it would appear that Officer Wilson did not have authority to execute the warrant, either because of a lack of statutory authority or because he was outside his jurisdiction, there was a law enforcement officer at the scene, Deputy Dearth, who did have such authority as well as a valid warrant.  Hence, there was no constitutional violation on the part of Officer Wilson and plaintiff is not entitled to relief.

**Deputy Dearth**

Plaintiff contends that Deputy Dearth violated his Fourth Amendment rights by conducting a search of plaintiff's back yard and conducting an illegal search and seizure on October 1, 2002.  As noted above, BCSO Deputy Dearth accompanied Officer Wilson to plaintiff's residence because the residence was outside of Officer Wilson's jurisdiction.  It is undisputed that the officers did not have a warrant at that time, but that they were on the property to conduct a follow-up investigation.  When Officer Wilson approached the door of the plaintiff's residence, to ensure officer safety Deputy Dearth moved towards the area of a white van that was parked near the residence with the side cargo doors open, from which point he could observe the backdoor of the residence.  His affidavit reflects that he observed the Coleman fuel container in plain view in the cargo compartment of the van and in walking back around the van, he observed what appeared to be the remnants of a

methamphetamine lab, including propane tanks with a bluish coloration to the valve area, a grill with some suspicious looking fluid running out of it and some tubing.[15] He did not touch or move the items, but notified Investigators Duncan and Bagwell.

Plaintiff contends that defendant Dearth's actions violated his Fourth Amendment rights.  The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed. 2d 576 (1967) ("The Fourth Amendment protects people, not places.").  Dearth cites *California v. Ciraolo*, 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.210 (1986) for the proposition that plaintiff has not established his subjective intent and desire to maintain privacy due to the fact that the items observed were in plain view.  In *Ciraolo* the Supreme Court upheld a warrantless aerial observation of a fenced-in backyard[16] within the curtilage of a home.  Defendant Dearth argues that the Fourth Amendment protection of the home has never been extended to preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible.  *Ciraolo*, 476 U.S. at 213, 106 S.Ct. at 181.  In this case, Dearth's observations were not made from a public vantage point, but from the plaintiff's own property.[17]  Plaintiff states that Dearth had no right to be there since Dearth and Wilson had no warrant and their intent was only to investigate, not to arrest.   (Doc. 43 at 2).  The plaintiff has not cited, and the court has not found a case holding that a law enforcement officer may not enter upon private property under these circumstances to merely continue an investigation of

---

[15]Plaintiff refers in his reply to the deposition of Greg Dearth taken for the state court case against him. An incomplete copy of this deposition, with several pages missing, was filed in plaintiff's criminal case. (Case 5:03cr16/RH, doc. 33). According to Dearth's testimony, when investigators Duncan and Bagwell responded, they noted additional items in plain view that he apparently had not noticed.  (*Id.* at 37).

[16]The yard was surrounded by a 6-foot outer fence and a 10-foot inner fence.  476 US at 209, 106 S.Ct. 1810.

[17]His affidavit states, however, that the remnants of the methamphetamine lab were visible from the neighboring property located east of plaintiff's property. (Dearth aff. ¶ 4).

possible illegal activity without a warrant.   Furthermore, the court notes that there is no suggestion that the officers had to go through any kind of barriers to approach plaintiff's home, whether electric fence or privacy fence, or that they left and reentered the property during the course of the investigation. *Michigan v. Tyler*, 436 U.S. 499, 516, 98 S.Ct. 1942, 1953, 56 L.Ed.2d 486 (1978), or that the homeowner at any point had told them to leave.

Plaintiff acknowledges that a "protective sweep" would not violate the Fourth Amendment, citing *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).  The scope of the search approved in *Buie* far exceeded what occurred in this case.   In *Buie* the Court said that incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.   494 U.S. at 334, 110 S.Ct. at 1098.  The "protective sweep" is inapplicable to Dearth's challenged conduct.

Plaintiff claims that to the extent the defendant relies on the "plain view" doctrine, it also is not applicable.   It is well-established that under certain circumstances, officers may seize evidence in plain view without a warrant. *Horton v. California*, 496 U.S. 128, 134, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) (internal citation omitted). The plain view doctrine will support a warrantless seizure if: (1) the officer was lawfully in the position from which the object was plainly seen; (2) the object was in plain view; (3) the object's incriminating nature was immediately apparent-i.e., the officer had probable cause to believe the object was contraband or evidence of a crime; and (4) the officer had a lawful right of access to the object itself. See *id*. at 136-37. Again, the critical question could be the officer's lawful right to be in the position in which he was in.  But here, there was no seizure based on what the officers observed. Instead, the officers' observations led to the acquisition of an arrest warrant, which subsequently provided a lawful basis for seizure.

### Deputies Duncan and Bagwell

Plaintiff asserts that these two defendants were acting in concert. He contends that they searched plaintiff's backyard and procured a search warrant for plaintiff's home based upon an affidavit that contained unspecified misrepresentations of material fact.

The record reflects that Deputies Duncan and Bagwell learned of the presence of the alleged methamphetamine lab on plaintiff's property from Deputy Dearth while Dearth was at the scene to assist in the execution of the arrest warrant. (Dearth aff. ¶ 8). Dearth explained to Duncan what he had observed in plain view, and then secured the scene upon Duncan's request until the other two deputies arrived. After Duncan was denied permission to search the mobile home, he left to obtain a search warrant. The search warrant authorized a search of plaintiff's residence and "the curtilage thereof, any vehicles parked thereon, and any persons present . . . " (Duncan aff., search warrant appended thereto). A subsequent search of the residence revealed additional evidence of a methamphetamine lab and an explosive device and related items as set forth above. The search was conducted pursuant to a warrant signed by a judicial officer. Although plaintiff contends in both his complaint and his affidavit (doc. 56 at 4) that Duncan made "material misrepresentations of fact" in his application for this search warrant, the alleged misrepresentations are not identified. Such conclusory allegations fail to state a constitutional claim and do not warrant relief. Thus, defendants are entitled to summary judgment on this issue.

Accordingly, it is respectfully RECOMMENDED:

That the special report of defendants Dearth, Duncan and Bagwell (doc. 20), construed as a motion for summary judgment, be GRANTED.

That defendant Wilson's special report (doc. 22), construed as a motion for summary judgment  be DENIED with respect to plaintiff's Fourth Amendment

stemming from the traffic stop on June 3, 2002, and GRANTED with respect to plaintiff's Fourth Amendment claim regarding the October 1, 2002 arrest and search,

That this case be referred back to the undersigned for further proceedings.

At Pensacola, Florida, this 27th day of July, 2007.

/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy thereof.  **Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.**  A copy of objections shall be served upon all other parties.  Failure to object may limit the scope of appellate review of factual findings. See 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).